ORIGINAL

LYNNARD SMITH D-89280
CSP-SOLANO, 20-E41
P.O. BOX 4000
VACAVILLE, CA. 95696-4000

FILED

MAY 1 6 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LYNNARD SMITH, | CASE NO. C-07-4089 JSW |
| PLAINTIFF, | DECLARATION OF LYNNARD SMITH SUPPORTING PLAINTIFF'S BRIEF OF OPPOSITION TO DEFENDANT'S SUMMERY JUDGMENT |
| V. | |
| STEVEN G. DAVIS, | |
| DEFENDANT | |

I, LYNNARD SMITH, DECLARES THE FOLLOWING:

1. I am the Plaintiff in the aforementioned case. I am competent to testify. I submit this Declaration in Support of Plaintiff's Brief of Opposition to Defendant's Summery Judgment.

2. I am currently housed at California State Prison Solano, since December 2005. During the incident set forth in Plaintiff's complaint, I was housed at the Correctional Training Facility, Soledad, California.

3. Defendant claims in his Motion for Summery Judgment that there were no material facts in dispute. In reality, there are many facts in dispute.

4. Defendant claims that Plaintiff never exhausted his

1.

administrative remedies relating to the retaliation claims. When in fact Plaintiff clearly exhausted all his administrative remedies. October 20, 2005, Plaintiff forwarded Inmate Appeal CTF-C-05-01802 to the Director Of Corrections for the Third Level Review, which is the final exhaustion remedies for the Department of Corrections and Rehabilitation. Plaintiff gave Defendant the opportunity to fully address the issues before Plaintiff filed the Civil Suit. Plaintiff stated the following:

> "No time prior to, during and/or after the incident on 2/21/05 was I threatening towards this officer, even after I was physically assaulted by C/O Davis. After the incident I was still reporting to work in the kitchen also. It was only after I was found not guilty of the constructed fabricated charges and about to be placed back in G.P. in CTF-Central, C/O Davis then made false threat assessment concerns. This was another reprisal against me for filing a 602 which was used to remove C/O Davis out of his post position 'CR-64'. All the 602's are related to this issues as a whole. (See related 602's Log # 1.) CTF-C-05-00663; 2.) CTF-C-05-01320 already forwarded to Sacramento for the Third Level Review. Everything done to me after I was found not guilty of the false charges was nothing but reprisal against me and my A1A should be restored". (See Exhibit "E" Administrative Appeal CTF-C-05-01802 at pg. PL.17).

Plaintiff's Inmate Appeal CTF-C-05-01802 was denied on January 24, 2006, at the Director's Level.

5. On February 19, 2005, I was assigned as an A.M. Preparation Cook. My direct Supervisor were the Correctional Supervisor Cook (CSC1). Defendant was a kitchen Officer, who supervised a Utility Crew.

6. February 19, 2005, Plaintiff asked permission of his Supervisor if I could leave work. As I attempted to leave through the gate to get my Identification Card from C/O Amoro, Defendant ran to the gate, blocking the exist, by placing his right hand on the gate and his left hand the wall.

2.

Plaintiff asked Defendant, " What are you doing, I am looking for C/O Amoro so I can get my I.D. Card." Defendant replied, " Get back in the gate, you're not going no where." Defendant started closing the gate on Plaintiff. Plaintiff then asked Defendant, "What are you doing, are you're just going to hit me with the gate?" Defendant just looked at Plaintiff while closing the gate. Plaintiff informed Defendant that he would be receiving an Inmate Appeal for the harassment and misconduct towards Plaintiff. C/O Amoro stepped out of the Staff Restroom and asked Plaintiff what was going on, Plaintiff replied, " My Supervisor said I could leave, can I get my I.D. Card?" C/O Amoro gave Plaintiff his I.D. Card, searched and let Plaintiff out the gate. As Plaintiff was leaving Defendant was standing against the wall staring at Plaintiff with one of his foot on the wall shaking his head in a up and down motion. Plaintiff just existed the kitchen area.

   7. February 20, 2005, Plaintiff asked Mr. Adams (CSC1), "Can I go get some salt and pepper from up front on the serving line?" Mr. Adams said, "Yes." As Plaintiff attempted to go through the open gate, Defendant ran over to the gate, jumped in front of Plaintiff. Plaintiff side stepped to his left saying, "Excuse me." Defendant side stepped to his right directly in front of Plaintiff stating, "You're not getting out of this gate like you did yesterday." plaintiff side stepped to his right saying, "Excuse me, I'm trying to to do my job." defendant side stepped to his left back in front of Plaintiff and then stated, "You're going to get into a wreck!" Defendant keep repeating the statement, "You're going to get into a wreck, You're going to get into a wreck!", as if he was challenging

3.

and threatening Plaintiff. Plaintiff informed Defendant that the further harassment, verbal threats, physical intimidation and misconduct would be documented against him in the Inmate Appeal. Defendant went and got his Supervisor, an unknown Black Sergeant to Plaintiff. They asked Mr. Adams (CSC1) if he allowed Plaintiff out of the gate. Mr. Adams confirmed to Defendant and The Unknown Black Sergeant that he did give Plaintiff permission to go out the gate.

8. February 21, 2005, approximately 0520 hrs., Plaintiff was inside the rest room alone cleaning it up. Defendant entered the rest room, looked at plaintiff and stated, "What's up Smith?" Plaintiff immediately exited the rest room. Plaintiff went inside the main kitchen, started talking to Inmate McClelland CDC# H-29611. Defendant walked past Plaintiff twice. Defendant then came back and stated, "Smith I need to talk to you." Plaintiff replied, " I don't want to do no secretive or private talking with you Davis, so could you call my Supervisor and I'll call another inmate to witness our conversation." Defendant became highly upset and started turning beat red with anger. Defendant motioned for Mr. Adams to come over to the sink area. Plaintiff asked I/M McClelland to stay and witness the conversation. Defendant then stated, "Smith the next time I hear you say 'who ya with' I will have you dragged out the kitchen for disrupting the program and write you a 115, do youhear me?" Plaintiff never responded. Defendant walked away shaking his head up and downing and saying, "You heard me!" Approximately 10 to 15 minutes later, Plaintiff was walking and talking to Inmate Lemming CDC# K-02882going past the butcher shop. Plaintiff asked

4.

1 I/M Lemming, "What's up, how are you doing this morning?" Defendant
2 ran out of the butcher shop stating, " That's it, That's it!"
3 Plaintiff and I/M Lemming keep on walking. Plaintiff walked around
4 to the Steamer Ovens where mr. Adams was standing. Plaintiff asked
5 Mr. Adams if I could speak with him, he yes. Plaintiff asked Mr.
6 Adams, "Do you feel like I was doing anything or saying anything
7 devastating this morning to disrupt the program in the kitchen?"
8 mr. Adams replied, "No." While Plaintiff was politely tlaking to
9 Mr. Adams, someone walked up behind Plaintiff and grabbed my left
10 upper arm and started pulling violently on Plaintiff. Once plaintiff
11 turned and recognized it was Defendant, Plaintiff asked Defendant,
12 "Why do you got your hands on me?, let me go Davis." Defendant never
13 said nothing. Plaintiff pulled out of Defendant's two hand grasp.
14 Defendant grabbed at Plaintiff a second time pulling, snatching
15 on Plaintiff's arm. Plaintiff asked Defendant, "Why do you got your
16 hands on me?, let me go Davis." Plaintiff again pulled out of the
17 two hand grasp. Defendant pressed his alarm simultaneously pulling
18 out his baton. Defendant took a combat stance against Plaintiff
19 with his hands in Plaintiff's face. Plaintiff just stood there
20 with his hands behind his back. C/O McCoy came to the alarm with
21 Sergeant B. Banda. Sgt. B. Banda asked Defendant what the problem
22 was? Defendant replied, "He needs to be escorted out, he's causing
23 disturbance." Plaintiff was cuffed up and escorted out of the
24 kitchen, and placed inside the Holding Cages while Correctional
25 Staff investigated the incident.

26     **9. February 21, 2005, Plaintiff was released out the Holding**
27 **cages, after Correctional Staff investigated the incident,**



1  determined Plaintiff was not a threat to the safety and security
2  of the institution. Plaintiff returned back to his housing unit
3  BW-208, and then went back to work the next day.

4      10.) February 21, 2005, Defendant **never** made any acusation
5  relating to 'Safety Concerns' relating to Plaintiff, to any
6  one of his Supervisors on the day of the incident or right **after**
7  the incident.

8      11. February 21, 2005, Mr. Adams (CSC1) or Mr. Baker (CSC1)
9  eyewitnesses to the incident, neither one of the Correctional
10 Supervisor Cooks, collaborated Defendant's alleged false version
11 of events when they were interviewed on the day of the incident
12 or when they were interviewed by Plaintiff's Investigative
13 Employee (I.E.) Correctional Officer G. Edwards. Had either
14 one of the Free Staff CSC1 collaborated the falsified facts
15 alleged by Defendant, Plaintiff would've been immediately placed
16 in Administrative Segregation, and determined a threat to the
17 'Safety and Security' of the institution, but that didn't happen,
18 Plaintiff was released from the Holding Cages.

19     12. Defendant's Declaration stated, "Plaintiff pulled away
20 again, raising his right clenched fist as if he were going to
21 hit me."(Defendant's Declaration Dated April 21, 2008, at pg.2,
22 Line-28). C/O McCoy responded to the alarm. He stated the follow-
23 ing, "At no time did I see Inmate Smith in an aggressive stand,
24 or with his fist clenched."(Plaintiff's Exhibit "B" at pg. PL.09)
25 Eyewitness, Mr. Adams was asked by Plaintiff's I.E. Correctional
26 Officer G. Edwadrs: "Question: Did Inmate Smith ever take a
27 fighting stance or had his hands clenched in a fist? Answer:

6.

1  No. He was just standing not moving till responding staff
2  arrived." (Plaintiff's Exhibit "B" at pg. PL.-08). Eyewitness
3  Mr. Baker was asked by Plaintiff's I.E. Correctional Officer
4  G. Edwards: "Question: Did Inmate Smith was in a fighting stance?
5  Answer: No. He just was standing there with his hands behind
6  his back." (Plaintiff's Exhibit "B" at pg. PL.-09).

7      13. February 21, 2005, Plaintiff never raised his fist
8  as if I was going to hit Defendant. Plaintiff's hands were behind
9  his back. Plaintiff never took a '<u>fighting stance</u>' or acted
10 as if I was becoming violent with Defendant. Plaintiff was not
11 being disruptive in the kitchen prior to the incident with
12 Defendant.

13     14. Plaintiff never told Defendant, "Get your fucking hands
14 off me." Defendant alleged that Plaintiff made the above
15 mentioned statement to Defendant. (Plaintiff's Exhibit "N" at
16 pg. PL.-55) Mr. Adams reported Plaintiff said, "Why are you
17 putting your hands on me?" (Plaintiff's Exhibit "B" at pg. PL.-
18 08). Defendant alleged the following: "I took '<u>several steps
19 back</u>' and drew my side handle baton, utilizing a basic cross
20 draw into a basic tuck position." (Plaintiff's Exhibit "N" at
21 pg. PL.-55). Correctional Officer C.J. McCoy stated, "I observed
22 C/O Davis with his side handle baton drawn in his right arm,
23 in a basic tuck position, with his left hand '<u>very close</u>' to
24 Inmate Smith's face." (Plaintiff's Exhibit "B" at pg. PL.-09).
25     15. February 22, 2005, Plaintiff reported to work. C/O
26 No 'safety concern' accusations. C/O Pearson saw Plaintiff,
27 walked into the break room, where Plaintiff and I/M McClelland

-7.-

1  was sitting. C/O Pearson stated, "What's up Smith, no hole,
2  no write-up, no nothing huh?" Plaintiff replied, "I didn't do
3  nothing." C/O Pearson replied, "Yeah, I spoke to Davis, he told
4  me that he grabbed you, I told Davis that he can't be snatching
5  on no Inmates, if he wanted to take you out the kitchen, he
6  first was suppose to tell you to come with him, if you didn't
7  want to come, he was then to call for an S&E, wait for the S&E,
8  then tell you to put your hands on the wall then cuff you up
9  and let you know that you're being escorted out of the culinary.
10 Not walking up behind no Inmates, grabbing on them." C/O Pearson
11 made other comments about how Defendant needed to be removed
12 out of the kitchen before he got someone hurt and how she would
13 have reacted to Defendant if she was in the situation as
14 Plaintiff was on 2/21/05. (Plaintiff's Exhibit "A" at pg. PL.-
15 02, Signed Declaration of Bobby McClelland Dated June 21, 2005).
16      16. February 23, 2005, Plaintiff reported to work. No
17 'safety concerns' accusations by Defendant.
18      17. February 24-25, 2005, was Plaintiff's Regular Days
19 Off (RDO). No 'safety concerns' accusations made by Defendant,
20 who was at work.
21      18. February 25, 2005, Plaintiff filed an Inmate Appeal
22 CTF-C-05-00663 against Defendant for the assault/misconduct
23 on Plaintiff on 2/21/05. (Plaintiff's Exhibit "I" at pg. PL.-
24 28).
25      19. February 26, 2005, Plaintiff and Defendant was at work
26 together in the Main Kitchen, during Plaintiff's entire shift.
27 No incidents happened, and Defendant <u>never</u> made a 'safety

concern' accusation, relating to Plaintiff on this day to none of his Supervisers.

20. February 26, 2005, at approximately 0900 hrs., after Plaintiff's work shift, Plaintiff went to the exercise yard. Plaintiff spoke to Sergeant Sirwit at the West Gate. Plaintiff asked Sgt. Sirwit if it would be possible for Plaintiff to be unassigned from the kitchen, because Plaintiff was not feeling comfortable working around Defendant. Plaintiff advised Sgt. Sirwit that I filed an Inmate Appeal against Defendant. Sgt. Sirwit advised Plaintiff that the 'Watch Commander' would not sign off on the CDC-115 wrote by Defendant on 2/21/05, and the CDC-115 has been sitting on his desk unauthorized. Sgt. Sirwit was one of Defendant's Supervisors, who also investigated the incident on 2/21/05.

21. February 26, 2005, at approximately 1800 hrs., Plaintiff was placed in Administrative Segregation for the falsified charge by Defendant, "Threatening A Public Official", to cover up his misconduct/assault on Plaintiff, and to retaliate against Plaintiff for the Inmate Appeal filed by Plaintiff on 2/25/05.

22. February 21-26, 2005, Defendant <u>never</u> made any accusations of 'Safety Concerns' relating to Plaintiff's presence at work in the kitchen.

23. February 27, 2005, Defendant signed and authorized a false Disciplinary Report Log No. I-02-05-16 to cover up his misconduct and to retaliate against Plaintiff for advising Defendant on 2/19/05 and 2/20/05 that an Inmate Appeal would be filed against his misconduct/assault.

9.

24. March 24, 2005, at approximately 1830 hrs., Sergeant Vasquez interviewed Plaintiff in Administrative Segregation. Sgt. Vasquez attempted to convince Plaintiff to recede Inmate Appeal CTF-C-05-00663 against Defendant. Sgt. Vasquez advised Plaintiff that Defendant would not be a further problem in the kitchen anymore, because Defendant has been removed out of the kitchen, and out of his work position 'CR-64'. Plaintiff refused to recede the Inmate Appeal. Sgt. Vasquez interviewed Defendant on 3/27/05, who was now re-assigned as a Wing Officer ('C-Wing'). Sgt. Vasquez was the Supervisor of the Central Kitchen and Defendant's Supervisor.

25. April 15, 2005, Plaintiff was found not guilty of the false charges, and found guilty of a lesser charge wrote by Defendant. Correctional Lieutenant J. Vera was going to send Plaintiff back to the kitchen, then he asked Plaintiff if I still wanted to work in the kitchen, Plaintiff advised Lt. Vera that I didn't want to work in the kitchen, so Lt. Vera advised Plaintiff that he would refer Plaintiff to Unit Classification Committee (UCC) for Program Review. Lt. Vera advised Plaintiff that he would go speak to Defendant and sternly advise Defendant that his conduct towards Plaintiff was unacceptable and would not be tolerated. (See Plaintiff's Exhibit "G" at pg. PL.24).

26. Approximately one (1) or two (2) days after Plaintiff was found not guilty of the constructed false charges, Plaintiff was scheduled to be released back to the General Population Level II, when Correctional Counselor Williams advised Plaintiff that a 'Threat' now existed between Plaintiff and Defendant,

10.

due to Defendant's beliefs. Counselor Williams asked Plaintiff "do you have any personal problems with C/O Davis?" Plaintiff replied, "No, I don't have any personal problem with C/O Davis, and there wouldn't be no problems between us, I just don't want to work around him any more. Even after the incident, I was reporting back to work and C/O Davis was at work during the same time and there wasn't any problems then, so it want be no problems when I get back to the Main Line." Counselor Willaims ended the interview. Now Plaintiff was retained in Administrative Segregation pending an Institutional Classification Committee hearing relating to the 'threat assessment' alleged by Defendant.

27. April 21, 2005, Plaintiff filed a second Inmate Appeal CTF-C-05-01320 challenging the guilty verdict in Disciplinary Report Log No. I-02-05-16, which was direct consequences of Defendant's false report retaliation action.

28. Approximately two (2) months after the incident on 2/21/05, after Plaintiff filed an Inmate Appeal CTF-C-05-00663, which was used to reprimand Defendant, removing him out of his job position CR-64; Plaintiff beating the false charges by Defendant; Defendant then made false 'safety concern' accusation, preventing Plaintiff from returning to the General Population, when no real 'threat' existed between Plaintiff and Defendant prior to the above-mentioned facts.

29. Plaintiff was transfered out of CTF-Soledad to CSP-Solano, due to the 'Threat Assessment' made by Defendant two months after the incident.

30. These factual disputes cannot be resolved without a

1 a jury trial. Defendant's Motion for Summery Judgment should
2 be denied and the facts put forth in front of a jury trial.
3     I declare under the penalty of perjury that the foregoing
4 is true and correct to the best of my knowledge and that this
5 declaration was executed on May 15, 2008, at Vacaville,
6 California.

                                    Lynnard Smith
                                    Plaintiff

12.

# PROOF OF SERVICE BY MAIL

## BY PRISONER "IN PRO PER"

I hereby certify that I am over the age of 18 years of age, that I am representing myself, and that I am a prison inmate.

My prison address is:   California State Prison - Solano
Housing: 20-E41
P.O. Box 4000
Vacaville, California 95696-4000

On the "*date*" specified below, I served the following document(s) on the parties listed below by delivering them in an envelope to prison authorities for deposit in the United States Mail pursuant to the "Prison Mailbox Rule":

Case Name: Lynnard Smith v. Steven G. Davis       Case #: C-07-4089 JSW

Document(s) Served: DECLARATION OF LYNNARD SMITH SUPPORTING PLAINTIFF'S BRIEF OF OPPOSITION TO DEFENDANT'S SUMMERY JUDGMENT

The envelope(s), with postage fully pre-paid or with a prison Trust Account Withdrawal Form attached pursuant to prison regulations, was/were addressed as follows:

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CALIFORNIA 94102

ATTN: CHRISTOPHER YOUNG
DEPUTY ATTORNEY GENERAL
455 GOLDEN GATE AVE, SUITE 11000
SAN FRANCISCO, CA. 94102-7004

I declare under penalty of perjury that the foregoing is true and correct. This declaration was executed on May 15, 2008, in Vacaville, California.

"*date*"

Signature: *Lynnard Smith*

Printed Name: LYNNARD SMITH